## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **NEW CINGULAR WIRELESS PCS LLC d/b/a AT&T MOBILITY,** | |
| *Plaintiff*, | Civil Action No. 18-1889 |
| **v.** | OPINION |
| **THE ZONING BOARD OF ADJUSTMENT OF THE BOROUGH OF NORTH HALEDON and THE BOROUGH OF NORTH HALEDON,** | |
| *Defendants*. | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of the Plaintiff New Cingular Wireless PCS LLC d/b/a AT&T Mobility's ("Plaintiff" or "AT&T") Motion for Summary Judgment. ECF No. 41.  Defendants the Zoning Board of Adjustment of the Borough of North Haledon (the "Board") and the Borough of North Haledon (the "Borough," and together with the Board, "Defendants") oppose the motion.  ECF No. 46.  For the reasons that follow, Plaintiff's motion is granted.

## I.   UNDISPUTED FACTS[1]

This case concerns whether the Board lawfully denied AT&T's application for a zoning variance to construct a cellular telephone monopole in the Borough.

---

[1] This recitation of the facts in support of the motion is drawn from the parties' Statements of Material Facts. Pl. SOMF, ECF No. 41.2; Def. SOMF, ECF No. 46.1.  Unless Otherwise noted, all facts are undisputed.

A.    AT&T's Monopole Variance Application

The Borough is a town of approximately 8,400 people in Passaic County, New Jersey.  Am. Compl. ¶ 12, ECF No. 23; Pl. SOMF ¶ 43.  It sits in a "heavily wooded area bounded by High Mountain to the west and a ridge to the east."  Am. Compl. ¶ 11.  Currently, there is an area in the northern portion of the Borough without reliable cell phone service.  Pl. SOMF ¶ 1.[2]  This includes an area of High Mountain Road, a "local thoroughfare," which, according to state transportation data, hosts thousands of daily traffic trips.  Am. Compl. ¶ 15.

AT&T sought to close this coverage gap by constructing a new monopole[3] in the northern portion of the Borough.  On February 16, 2017, AT&T submitted an application (the "Application") to construct a monopole (the "Proposed Facility") at 5 Sicomac Road, near the intersection of Sicomac Road and High Mountain Road.  Pl. SOMF ¶¶ 15, 31.  The site for the Proposed Facility "includes a mix of commercial and retail uses, including a bank, medical office space, stores, several restaurants, and a Foodtown supermarket."  Id. ¶ 15.

Under the Borough's Code, wireless telecommunications towers are prohibited on private property in Residential zones, permitted on Borough-owned property, and conditionally permitted in the Borough's Business and Industrial zones.  Id. ¶ 11-12; see also (Borough Code §§ 600-160, 600-161, 600-162, Wilbur Cert. Ex. H, ECF No. 41.11.  The only Business or Industrial zone in the northern portion of the Borough "is the B-1 zone at the intersection of High Mountain Road and Sicomac Road," the location of the Proposed Facility.  Id. ¶ 14.

---

[2] Defendants purport to dispute that there is a gap in coverage in the borough, but they have failed to point to any evidence in the record to the contrary.

[3] "A monopole is a telecommunications tower used to transmit wireless telephone signals."  Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp., 181 F.3d 403, 405 n.2 (3d Cir. 1999).

AT&T's Proposed Facility consists of a 143-foot tall "'monopine' with simulated pine branches extending around and below the height of AT&T's dozen antennas in a triangular array near the top." Id. ¶ 33. Although the Proposed Facility would initially host only equipment from AT&T, it has the capacity to host equipment from three other carriers. Id. ¶ 34. AT&T sought a number of variances from the Borough Code for the Proposed Facility: a variance permitting a second principal use on the site, if applicable, a height variance for the monopole,[4] a variance from the required setback of "300% of the height of the tower" from certain residential units or zoned land, Borough Code § 600-162(B)(5)(a)[2], and a number of variances to physically accommodate the Proposed Facility on the site and for the size of its equipment. Id. ¶¶ 35, 38-39.[5]

## B.    The Board's Hearings

The Board held four hearings over an eight month period on AT&T's application. Id. ¶ 41. At these hearings, AT&T presented testimony from a number of experts on radio frequency energy, radio frequency engineering, general engineering, a planning expert, and a real estate appraiser. Id. ¶¶ 42-59. Neither the Board nor any objector presented expert testimony on any of these subjects. Id. ¶ 60.

---

[4] The Borough Code permits towers of up to 90 feet for a single user, and up to 150 feet for three or more users. Borough Code § 600-166. Although the Proposed Facility could accommodate three additional carriers, AT&T submitted the application only on its own behalf, and therefore sought a variance if the Board deemed this limitation applicable. Pl. SOMF ¶ 35. The Board apparently determined that it was applicable, because in its resolution denying AT&T's Application, it listed the monopole's height as a requested variance. See January 10, 2018 Resolution of Findings and Conclusions, Board of Adjustment of North Haledon (the "Board Resolution") ¶ 4, Wilbur Cert. Ex. S, ECF No. 41.22. During this litigation, Defendants do not dispute that the Proposed Facility complies with the height restriction. Pl. SOMF ¶ 36 ("Defendants confirmed the lack of need for height variance for AT&T's proposed facility in interrogatory answers in this action.).

[5] Specifically, these variances were: (1) a reduced side yard set back from the wooded area behind the neighboring property of 13.33 feet, rather than the required 20 feet; (2) a reduced rear yard set back of 34.29 feet rather than the required 50 feet; (3) an increased equipment shed height of 10 feet 5 inches, rather than the required 10 feet; (4) a variance reducing the width of parking spaces on the site from 10 feet wide to nine feet wide, while retaining the number of required parking spaces. Pl. SOMF ¶¶ 38-39; Board Resolution ¶ 4.

3

At the May 4, 2017 hearing, AT&T presented testimony from Daniel Penesso, a radio frequency engineer.  Id. ¶ 42.  He testified "that there was an area in excess of two square miles in the northern part of the Borough where AT&T customers lacked reliable access to personal wireless facilities," and that "the [Proposed Facility] was proposed at the minimum height necessary to remedy the gap."  Id.  He further testified that "due to topography, there were no alternatives capable of remedying the entire gap" in the Borough, and "potential locations in neighboring towns to the north or on Borough-controlled lots to the south could not remedy the gap."  Id. ¶¶ 45-46.  A different technological solution, known as a distributed antenna system ("DAS") was "not a feasible solution, particularly for in-building coverage, due to the large gap in question."  Id. ¶ 47.

At that same hearing, AT&T presented testimony from Jim Dowling, a planning expert. Id. ¶ 49.  Dowling prepared a visual analysis and testified that based on the design of the tower and the topography of the region, the Proposed Facility would have "a minimal visual impact."  Id. ¶ 51.[6]  He further concluded that the dimensional variances for the rear and side set backs, the equipment shed height variance, and the reduction in sizes of the parking spaces would have no detrimental effects, would not impair the town's zoning plan, and would not cause a substantial detriment to the public good.  Id. ¶¶ 55-56.  Dowling also testified that the requirement that the tower be set back three times its height from the nearest residence was excessive, and that the tower's setback was sufficient for its 143-foot height, because it was "approximately 243 feet" away from the nearest residential property.  May 4, 2017 Hr'g Tr. at 77:13-78:22; Pl. SOMF ¶ 52.

---

[6] Defendants admit that this is the substance of Dowling's testimony.  Def. SOMF ¶ 51.  In fact, Dowling's visual analysis consisted of photographs of a balloon at the same height and in the same location as the proposed facility, each of which he reviewed and discussed before the board.  See May 4, 2017 Hr'g Tr. at 65:2-69:10, Wilbur Cert. Ex. C.

He further testified that this restriction could not be satisfied anywhere in the Borough.  Pl. SOMF ¶ 52.

At another hearing on June 14, 2017, AT&T presented expert testimony from Mark Tinder, a real estate appraiser.  Id. ¶ 59.  Tinder testified it was his "conclusion that there would be no reasonable potential value impact that would be associated with" the Proposed Facility.  June 14, 2017 Hr'g Tr. 29:17-19, Wilbur Cert. Ex D, ECF No. 41.7; Pl. SOMF ¶ 59.

### C.   The Resolution Denying AT&T's Application

The Board voted to deny AT&T's Application on November 17, 2017, and adopted the corresponding Board Resolution on January 10, 2018.  Pl. SOMF ¶ 63.  The Board found the Proposed Facility would not fill the entire coverage gap, that "testimony as to dropped calls was less than clear and was unpersuasive," and that it heard "insufficient testimony . . . as to alternative sites for the installation or other technologies" to close the gap.  Board Resolution ¶ 10(a).

The Board also noted that the Proposed Facility did not satisfy the Borough's requirement that it be set back 300% of its height from the nearest residential property, but did not address any benefit or detriment of granting this variance.  Id. ¶ 10(d).  The Board provided no context or rationale in failing to address this requested variance.

The Board also found that AT&T had not sufficiently addressed whether the Proposed Facility could be located elsewhere on the site, and noted that AT&T had not attempted to purchase additional property to lessen or eliminate the need for bulk variances.[7]  Id. ¶ 10(e).  The Board found AT&T did not demonstrate any legal hardship for the numerous requested bulk variances,

---

[7] A "bulk variance" is shorthand for variances authorized under N.J.S.A. § 40:55D-70(c), which permits applicants to seek variances from the strict application of individual rules to a piece of property or its structures.  N.J.S.A. § 40:55D-70(c).  The "bulk variance" is contrasted with the "use variance" under N.J.S.A. § 40:55D-70(d), which permits local zoning boards to grant variances for nonconforming uses.

which it found "contrary to the intent and purpose of the Borough's zoning code," but did not explain why.  Id. ¶ 10(f).

The Board further found that the "main benefit" from the Proposed Facility was "for only the business purposes of [AT&T] and not that of the Borough or its residents."  Id. ¶ 10(g).  There was no testimony as to lack of cell coverage from other providers, and no "residents testif[ied] that they have a problem securing cell coverage in the immediate area."  Id.  Rather, there was testimony "from the public that cell coverage was available in the area in close proximity to the proposed tower," and AT&T introduced "[n]o evidence to the contrary."  Id.

The Board also concluded the Proposed Facility "would have a negative impact on the aesthetics of the property for both the surrounding properties and the public at large" because a "cell tower is an aesthetically displeasing structure no matter what is done to disguise it," and it would be "located at the intersection of two busy streets and is in a prominent area of the community."  Id. ¶ 10(h).  It would also "negatively impact" the view of High Mountain, a "preserved treasure in the Borough" across High Mountain Road from the proposed facility.  Id.

The Board also rejected AT&T's expert testimony that the Proposed Facility would not adversely impact property values in the immediate area.  Id. ¶ 10(j).  The Board found. Tinder's testimony "not conclusive nor persuasive," because the Borough "is a unique community, with different topographical fixtures such as mountains, valleys, fields and brooks" that was dissimilar from the area that formed the basis of Tinder's comparisons.  Id.  The Board also found that his data was "dated and not current," and that the market changes with time and location.  Id.

Finally, the Board concluded that variances "are for land use concerns and not technological reasons that may change as technology advances," and that permitting the Proposed

6

Facility "would be inimical to the public good and welfare and substantially impair the intent and purposes of the Borough's zoning plan and scheme." Id. ¶¶ (k)-(l).

## II.    PROCEDURAL HISTORY

AT&T filed this action on February 9, 2018.  Compl., ECF No. 1.  Defendants answered the Complaint on April 18, 2018.  ECF No. 9.[8]  Plaintiff brings three claims, all against both the Borough and the Board:  (1) violation of the Telecommunications Act of 1996 (the "TCA"), 47 U.S.C. § 332(c)(7)(B)(iii), by denying its Application to construct the Proposed Facility in a decision that was not supported by substantial evidence, Am. Compl. ¶¶ 61-74 ("Count I"); (2) that the Board's denial of its Application for the Proposed Facility "has the effect of prohibiting the provision of personal wireless services" in violation of the TCA, 47 U.S.C. § 332(c)(7)(B)(i)(II), Am. Compl. ¶¶ 77-79 ("Count II"); and (3) that the Board's denial of its Application "is arbitrary, capricious and unreasonable" in violation of New Jersey's Municipal Land Use Law ("MLUL"), N.J.S.A. § 40:55D-1 et seq. ("Count III").

On October 4, 2019, after taking discovery, AT&T filed this motion for summary judgment on Counts I and II of the Amended Complaint.  See ECF No. 41.

## III.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[S]ummary judgment

---

[8] Plaintiff amended its complaint with Defendants' consent on November 21, 2018.  ECF Nos. 22, 23.  By stipulation, Defendants' earlier answer applied to the Amended Complaint.  ECF No. 22.

may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  All facts and inferences must be construed in the light most favorable to the non-moving party.  Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

## IV.   DISCUSSION

AT&T argues that the Borough's denial of its conditional use variance was not supported by substantial evidence, and that the denial amounts to an effective prohibition of services, both in violation of the TCA.  The Court agrees as to both points.

### A.     The TCA

The TCA seeks to strike a balance between its goal of  "'encourag[ing] the rapid deployment of new telecommunications technologies,'" without unduly encroaching on traditional local zoning authority.  T Mobile Ne. LLC v. City of Wilmington, Del., 913 F.3d 311, 315 (3d Cir. 2019) (quoting Preamble, TCA, Pub. L. No. 104-104, § 1, 110 Stat. 56, 56 (1996)).  To this end, it "expressly preserves the traditional authority enjoyed by state and local government to regulate land use and zoning, but places several substantive and procedural limits upon that authority when it is exercised in relation to personal wireless service facilities."  APT Pittsburgh Ltd. P'ship v. Penn Twp. Butler Cty. of Pa., 196 F.3d 469, 473 (3d Cir. 1999).  The TCA permits those parties who have been adversely affected by a final decision of a state or local government to bring an action in any court of competent jurisdiction within 30 days of that decision.  Id. at 474 (citing 47 U.S.C. § 332(c)(7)(B)(v)).

Two of those limits are relevant here:  the requirement that any decision denying a request to construct a personal wireless facility be supported by substantial evidence, and the requirement that the regulation of personal wireless facilities shall not prohibit or have the effect of prohibiting

them.  47 U.S.C. § 332(c)(7)(B)(i)(II), (c)(7)(B)(iii).  The Court will address each subsection in turn.

###  B.        The TCA's Substantial Evidence Requirement

The TCA requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).  The TCA's "substantial evidence" standard is the "the traditional, deferential" standard.  APT Pittsburgh, 196 F.3d at 474.  "Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus, 197 F.3d 64, 71 (3d Cir. 1999) (quoting Pierce v. Underwood, 487 U.S. 552, 565 (1988)).  Under this standard, a reviewing court must "determine whether there is substantial evidence in the record as whole to support the challenged decision."  Id.  On review, the Court may not "weigh the evidence contained in [the] record or to substitute its own conclusions for those of the fact-finder," id., but where the record contains conflicting evidence, the Court must determine whether the fact-finder "adequately explain[ed] its reasons for rejecting or discrediting competent evidence."  Sprint Spectrum, L.P. v. Zoning Bd. of Adjustment of the Borough of Paramus, 606 F. App'x 669, 672 (3d Cir. 2015).

While the Court's review under the TCA's substantial evidence provision is deferential, "the decision process itself is governed by applicable state and local zoning laws.  The reviewing court's task is to determine whether the decision, as guided by local law, is supported by substantial evidence."  Ho-Ho-Kus, 197 F.3d at 72.  Thus, to be supported by substantial evidence, the decision must also accord with the relevant standard under the MLUL.  Id.

The MLUL empowers a local zoning board of adjustment to grant variances, subject to certain conditions.  N.J.S.A. § 40:55D-70(c), (d).  An applicant for a variance bears the burden of demonstrating they satisfy both the "positive criteria" and the "negative criteria" of the specific provision under which they seek a variance.  Ten Stary Dom P'ship v. Mauro, 216 N.J. 16, 29-30 (2013).  The "positive criteria" refers to either the specific requirements for a variance in either N.J.S.A. § 40:55D-70(c) or the first paragraph of subsection (d) (depending on the type of variance sought), while the "negative criteria" refers to the requirements of the second paragraph of subsection (d).  New Brunswick Cellular Tel. Co. v. Borough of S. Plainfield Bd. of Adjustment, 160 N.J. 1, 6 (1999).

The positive criteria under N.J.S.A. § 40:55D-70(c) depend on whether the applicant seeks a variance under subsection (c)(1) or subsection (c)(2).  Under subsection (c)(1), an applicant "must establish that the particular conditions[9] of the property present a hardship."  Ten Stary Dom, 216 N.J. at 29.  The positive criteria under subsection (c)(2) require the applicant to demonstrate that "the purposes of [the MLUL] . . . would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment."  N.J.S.A. § 40:55D-70(c)(2).  For a variance under subsection (d), the positive criteria require the applicant to demonstrate "special reasons" for the variance, which New Jersey's courts have interpreted to mean "an applicant must prove that 'the use promotes the general welfare because the proposed site is particularly suitable for the proposed use.'"  Smart SMR of N.Y., Inc. v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 323 (1998) (quoting Medici v. BPR Co.,

---

[9] The statute enumerates these conditions as: "(a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property, or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon."  N.J.S.A. § 40:55D-70(c)(1).

107 N.J. 1, 4, (1987)).  The standard for establishing the positive criteria "is contingent on the type of variance at issue."  Cell S. Of N.J., Inc. v. Zoning Bd. of Adjustment Of W. Windsor Twp., 172 N.J. 75, 83 (2002).  Where the applicant seeks a variance under subsection (d)(3), pertaining to a nonconforming conditional use, "the applicant must demonstrate that the site remains suitable for the use notwithstanding any nonconformity."  Id.

The negative criteria, which are the same for all variances, require the applicant to demonstrate that the variance "can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance."  N.J.S.A. § 40:55D-70(d).

New Jersey law has established particular standards for proposed personal wireless facilities under the MLUL.  An applicant can satisfy the positive criteria (under either subsection (c)(2) or (d)) by demonstrating that the applicant has an Federal Communications Commission ("FCC") license and that the use is particularly suited to the proposed site.  New Brunswick Cellular, 160 N.J. at 7.  A variance applicant can demonstrate that a site is particularly suited for a proposed personal wireless facility by demonstrating a need for the facility at the proposed site.  T-Mobile Ne. LLC v. Borough of Leonia Zoning Bd. of Adjustment, 942 F. Supp. 2d 474, 486 (D.N.J. 2013).

> 1. **The Board's Variance Denial Was Not Supported by Substantial Evidence**

AT&T argues that the Board made several legal errors and unfounded factual conclusions in denying its Application, that AT&T's Application satisfied the positive and negative criteria, and thus that the Board's decision was not supported by substantial evidence.  Pl Mem. at 14-24, ECF No. 41.1  The Court agrees.

a.    The Board Decision on the Positive Criteria is Not Supported by Substantial Evidence

The parties do not dispute that the Proposed Facility is conditionally permitted use in a B-1 zone.  Pl. SOMF ¶¶ 12, 15.  In its Resolution denying the Application, the Board noted that where an applicant has an FCC license, that "will ordinarily suffice for the carrier to establish that its use generally serves the general welfare."  Board Resolution ¶ 9.  The Board then correctly noted that AT&T still bears the burden of demonstrating that the proposed site is particularly suited to its proposed use in order to satisfy the positive criteria.  Id.  In order to do so, AT&T "must show the need for the facility at that location," which it may do "through competent expert testimony that its existing capacity to serve the public in the area was inadequate."  New Brunswick Cellular, 160 N.J. at 14.

Here, AT&T  is an FCC-licensed personal wireless service provider,[10] and established a need for the Proposed Facility in the northern portion of the Borough through expert testimony.  Defendants concede AT&T's radio frequency expert, Daniel Penesso, testified that the northern portion of the Borough contains an area of two square miles where customers cannot get reliable service.  Pl. SOMF ¶ 42.  However, the Board failed to mention this testimony, noting instead that the Proposed Facility "would fill in some of the gaps in coverage" but not all such gaps, and noted that "[t]here was no testimony from anyone indicating that he or she did not have cellular coverage in the immediate area," and some residents testified "that cell coverage was available in the immediate area."  Board Resolution ¶¶ 10(a), (g).

_____

[10] There does not appear to be any dispute of fact as to this point, although it does not appear in the parties Statements of Material fact.  AT&T's litigation expert, Dominic C. Villecco, reports that AT&T had such a license.  Villecco Report at 8, Wilbur Cert. Ex. I, ECF No. 41.12.

Case 2:18-cv-01889-MCA-ESK   Document 51   Filed 06/29/20   Page 13 of 24 PageID: 620

The Board had no basis for making this finding.[11]  Although the Board is not required to accept expert testimony and may reject it where appropriate, it may not rely on "residents' unsubstantiated testimony" to do so.  Cell South, 172 N.J. at 88.  Additionally, AT&T was not required to demonstrate that the Proposed Facility would completely close the coverage gap, only that the gap would be mitigated by it.  T-Mobile Ne., 942 F. Supp. at 486.  Thus, the Board's conclusions to the contrary were not supported by substantial evidence.

AT&T also argues that the Board's conclusion that it heard insufficient testimony concerning alternate sites and technologies to close the gap is not supported by the record.  Pl. Mem. at 17.  The Court agrees.

Defendants admit that the number of possible alternate sites in the Borough is limited, because personal wireless facilities are only permitted on Commercial, Industrial or Borough-owned land, and are not in Residential zones.  Pl. SOMF ¶¶ 11-12.  They further concede that two possible alternatives—the commercial zone across the street from the Proposed Facility, and a utility authority property—are unavailable because their owners would not permit AT&T to use their property.  Id. ¶ 17.  Penesso also testified that there are no other alternative locations in the Borough that would remedy the coverage gap, and specifically discussed locations in neighboring towns to the north or the use of Borough-controlled lots to the south.  Id. ¶ 46.  Given this extensive testimony, the Board's unsupported assertion that "there was insufficient testimony adduced" as to alternate sites is not supported by the record. Board Resolution ¶ 10(a).  The same is true of its conclusion that it heard insufficient testimony as to "other technologies which may provide the needed coverage.  Id.  Penesso testified, in response to a question from the Board, that an alternate

---

[11] There is no assertion in the record on this Motion that any of AT&T's experts, the only experts to testify, were unqualified.

technology, DAS, was not technologically feasible.  Pl. SOMF ¶ 47.  The Board Resolution does not mention any other technology that could be used to close the gap.

Additionally, the Board failed to address some of AT&T's specific requests for variances. As to AT&T's request for a variance permitting the Proposed Facility to be within three times its height of a residential building, the Board simply noted that the Application did not comply with this requirement.  Board Resolution ¶ 10(d).  The Board also simply stated that AT&T had "failed to carry its burden" for a height variance for the tower, without stating any reason for this conclusion.  Id. ¶ 10(c).  As noted above, in evaluating whether to grant a variance for a conditionally-permitted use, the Board was required to evaluate whether the site remains suitable for the use, notwithstanding any nonconformity.  Cell S. of N.J., 172 N.J. at 83.  These determinations cannot be supported by substantial evidence, as they are not supported by any reasoning.

Therefore, the Board's conclusion that AT&T had failed to satisfy the positive criteria was not supported by substantial evidence.  Because AT&T has an FCC license for its personal wireless services, and has demonstrated that the Proposed Facility will remedy the coverage gap, it has satisfied the positive criteria.

### b. The Board Incorrectly Found that AT&T Had Not Satisfied the MLUL Negative Criteria

AT&T also contends that the Board erred in finding its Application failed to satisfy the negative criteria.  The Court agrees.

As an initial matter, AT&T first argues that the Board considered its showing on the negative criteria under the wrong standard.  Pl. Mem. at 19-20.  It contends that the Board Resolution's statement that AT&T "must demonstrate" that it meets the negative criteria "through an enhanced quality of proof" is incorrect as a matter of law, because this standard is only

applicable to variances for prohibited uses rather than conditional uses.  Board Resolution ¶ 9.  The Court agrees.

The standard of proof required by an applicant for a variance permitting a prohibited use is significantly more demanding.  It requires "clear and specific findings by the board of adjustment that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance."  Medici, 107 N.J. at 21.  But this standard is simply inapplicable to conditional use variances, which do not require any enhanced proof and only require a board of adjustment "to determine whether, notwithstanding the failure of one of the conditions, the proposal was reconcilable with the zone."  TSI E. Brunswick, LLC v. Zoning Bd. of Adjustment of Twp. of E. Brunswick, 215 N.J. 26, 46 (2013).  To require an enhanced quality of proof would "effectively erase the distinction that a conditional use creates.  Rather than recognizing that the use is essentially permitted, albeit with conditions, we would be presuming that the use is prohibited unless the conditions are met or are proven in accordance with the standards ordinarily required to secure a use variance."  Id.  To the extent the Board required AT&T to meet the negative criteria by an enhanced quality of proof, its determination was not supported by substantial evidence.

But even under the correct standard, the Board did not properly consider the negative criteria.  When seeking a variance for a conditional use, the Board is required to asses "the effect of non-compliance with one of the conditions as it relates to the overall zone plan."  Id. at 43.

Here, the Board did not evaluate the effect of the degree of deviance from the Borough's conditions.  The Board did not perform any analysis of the effect of the deviations for AT&T's requested bulk variances under subsection (c).  Instead, it merely concluded that the requested variances were "contrary to the intent and purposes of the Borough's zoning code," without elaboration.  Board Resolution ¶ 10(f).  The requested variances included a five inch height

increase for AT&T's equipment shed, a reduction of only one foot of width in the size of parking spaces to accommodate the Proposed Facility, an approximately 15-foot reduction in the required rear setback, and a reduction of less than seven feet in the side yard setback.  Id. ¶ 4.  There is no evidence in the record that any of these variances would have more than a de minimis effect on the either the public good or the intent and purpose of the zoning plan:  the five inch increase in equipment shed height is merely to accommodate a standard shed AT&T uses which fits its equipment, the reduction in width of the parking spaces would reduce their width from ten feet to nine feet (still significantly larger than many other parking spaces, and would actually add three parking spaces to the lot), and there are significant buffer areas to mitigate any effect of the reduced setbacks.  May 4, 2017 Hr'g Tr. at 74:2-75:12.  There is nothing in the record to suggest that any effect of these deviations is a detriment to the public good or contrary to the intent and purpose of the zoning plan.

AT&T also contends that, contrary to the Board's finding, it satisfied the Borough's  tower height requirement.  Pl. Mem. at 20-21.  It argues that because Borough Code § 600-166 permits towers of up to 150 feet "for three or more users," its 143-foot Proposed Facility that could host AT&T and three other carriers meets this condition.  Id.; Pl. SOMF ¶¶ 33-34.  The Court agrees. The plain language of this provision does not require that three or more carriers actually use the Proposed Facility at the time of construction, merely that it be capable of hosting that number of providers.  The Board's conclusion to the contrary is not supported by substantial evidence.  Board Resolution ¶ 10(c).

AT&T also demonstrated that there is no detriment arising from a variance to the Borough's setback requirement.  The Borough requires that  all wireless telecommunication towers on private property to be either "200 feet or 300% of the height of the tower, whichever is greater"

from any residential unit.  Borough Code § 600-162(B)(5)(a)[2].  Because AT&T's Proposed Facility would be 143 feet tall, under this provision it would need to be 429 feet from the nearest residential structure.  Pl. SOMF ¶ 35.

AT&T's planning expert, James Dowling, testified that AT&T's Proposed Facility was approximately 243 feet from the nearest residential structure, approximately 100 above the height of the monopole.  May 4, 2017 Hr'g Tr. at 77:14-25.  To the extent that the zone plan includes this requirement to protect residential structures in the event of a tower collapse, this setback would still ensure there would be nearly one hundred feet between the top of the tower and the nearest residential structure.  There is nothing in the record to suggest that a greater setback would advance the public good or the Borough's zone plan.  Additionally, Defendants admit that the 300% setback requirement could not be satisfied anywhere in the Borough.  Pl. SOMF ¶ 52.  Plaintiffs have therefore carried their burden in demonstrating that there is no detriment from its variance for this requirement.[12]

Finally, AT&T argues that there is no suggestion of any detrimental impact on neighboring properties in the record.  The Court agrees.

The Board found that AT&T's proposed facility would negatively impact the aesthetics of the Borough, the view of High Mountain, and property values near Proposed Facility.  Board Resolution ¶ 10(h)-(j).  The Board rejected the testimony of AT&T's expert real estate appraiser, Mark Tinder, who concluded that the Proposed Facility would have no adverse effect on adjacent

---

[12] Plaintiff also argues that this provision of the Borough Code is invalid because it is impossible to satisfy any place that it applies, thus requiring wireless towers to be constructed only on Borough-owned land. Pl. Mem. at 23. Plaintiff has failed to demonstrate that they are entitled to summary judgment on this point, as they have not shown that the tower separation requirement does not apply to towers placed on Borough-owned land (thereby forcing the use of such land). The Borough Code expressly requires the separation distance for "all towers and antennas for which an approval is required" Borough Code § 600-162(B)(5), and § 600-160 suggests that approval by the Mayor and Council is required before constructing a tower on Borough-owned land.

property values.  Pl. SOMF ¶ 59.  It found his testimony neither "conclusive nor persuasive" because the data he used was "dated" and he failed to account for the Borough's "topographical fixtures such as mountains, valleys, fields and brooks."  Board Resolution ¶ 10(j).  While it was permissible for the Board to reject Tinder's expert opinion, "[p]roof of an adverse effect on adjacent properties and on the municipal land use plan . . . generally will require qualified expert testimony.  Bare allegations that the construction of a tower or monopole will cause a decline in property values rarely will suffice." Cell S. of N.J., 172 N.J. at 87 (quoting Smart SMR of N.Y., 152 N.J. at 336).  There was no other expert testimony in the record as to the value of adjacent properties, and thus the Board could not permissibly conclude that the Proposed Facility would have an adverse effect in property values.

As to the aesthetic effects of the Proposed Facility, the Board "may deny a variance to construct a monopole based on aesthetics, but its reasoning must be supported by substantial evidence."  Sprint Spectrum L.P. v. Zoning Bd. of Adjustment of Borough of Paramus, N.J., No. 09-4940, 2010 WL 4868218, at *15 (D.N.J. Nov. 22, 2010) aff'd, 606 F. App'x 669 (3d Cir. 2015).  "A few generalized expressions of concern with 'aesthetics' cannot serve as substantial evidence."  Id.  (quoting Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp., 181 F.3d 403, 409 (3d Cir. 1999)).  Here, the Board's generalized mention of "aesthetics" is insufficient to conclude that there is substantial evidence of a substantial detriment to the public good.

AT&T has therefore demonstrated that it satisfied the positive and negative criteria under the MLUL, and that the Board's denial of its application was not supported by substantial evidence.  AT&T is entitled to summary judgment on Count I.

C.      AT&T's Prohibition of Services Claim Under the TCA

AT&T also moves for summary judgment on Count II, its claim under 47 U.S.C. § 332(c)(7)(B)(i)(II).  This subsection of the TCA prevents state and local governments from regulating the placement and construction of personal wireless service facilities that have "the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).  The Court agrees that the Board's determination has the effect of prohibiting the provision of personal wireless service facilities, in violation of the TCA.[13]

1.      The Relevant Standard for an Effective Prohibition

AT&T argues that a recent declaratory ruling from the FCC determines which state or local regulations have "the effect of prohibiting the provision of personal wireless services" under the TCA.  Id.  The Court disagrees.

On September 18, 2018, the FCC released In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv., 33 F.C.C. Rcd. 9,088, 9,088 (2018) (the "2018 Declaratory Ruling").  In this ruling, the FCC "reaffirm[ed] . . . that a state or local legal requirement constitutes an effective prohibition if it 'materially limits or inhibits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment.'"  Id. at 9,102 (quoting In re California Payphone Ass'n, 12 F.C.C. Rcd. 14,191, 14,206 (1997)).  In articulating that this standard should govern effective prohibition claims under the TCA, the FCC expressly rejected decisions of Courts of Appeals—including the Third Circuit—that had required a plaintiff to show a "coverage gap" before a state or local requirement could amount to an effective prohibition.  Id.  at 9,106 n.94 ("Accordingly, we reject both the

_____

[13] The Court notes that Defendants' Brief in opposition to this motion did not address this aspect of AT&T's motion for summary judgment at all.

version of the "coverage gap" test followed by the First, Fourth, and Seventh Circuits . . . and the version endorsed by the Second, Third, and Ninth Circuits."). Under the new test, a state or local requirement is an effective prohibition if it "materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service." Id. at 9,104.

AT&T contends that this standard should apply here, because the FCC administers the TCA, and its reasonable interpretations of ambiguous statutory language are entitled to deference by courts. Pl. Mem. at 26; Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005) (courts must defer to agency change in interpretation of an ambiguous term in a statute, where Congress has delegated authority to the agency to interpret the statute, overriding earlier contrary interpretations by Court of Appeals).

The FCC adopted the 2018 Declaratory Ruling on September 18, 2018, more than nine months after the Board denied AT&T's application on January 10, 2018. Pl. SOMF ¶ 63. Thus, to the extent that the 2018 Declaratory Ruling establishes a new rule, applying it to the Board Resolution would give it retroactive effect. "Retroactivity is not favored in the law. . . . [A]dministrative rules will not be construed to have retroactive effect unless their language requires this result." Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988). There is no suggestion in the 2018 Declaratory Ruling that its ruling should apply retroactively. Additionally, the 2018 Declaratory Ruling could apply to proceedings completed before its adoption if it does "'not alter existing rights or obligations [but] merely clarifie[s] what those existing rights and obligations ha[ve] always been.'" Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 506 (3d Cir. 2008) (Appalachian States Low–Level Radioactive Waste Comm'n v. O'Leary, 93 F.3d 103, 113 (3d Cir.1996)). Four factors aid in determining whether a rule alters or clarifies rights or obligations: (1) whether the text of the prior rule was ambiguous; (2) whether the new rule

20

resolved, or attempted to resolve, that ambiguity, (3) whether the new rule's resolution of the ambiguity is consistent with the text of the prior regulation; and (4) whether the new rule is consistent with the agency's prior treatment of the issue. Id. at 507.  Notably, the Third Circuit does not "take the fact that an amendment conflicts with a judicial interpretation of the pre-amendment law to mean that the amendment is a substantive change and not just a clarification." Id.

The 2018 Declaratory Ruling is not a mere clarification, but rather an alteration of existing rights and obligations.  First, there is no relevant "prior rule" applicable to this case.  While the FCC stated in its 2018 Declaratory Ruling that it was reaffirming the standard from California Payphone, that earlier ruling "was limited to a [TCA] Section 253(a) claim.  Section 332 was not addressed by the FCC in California Payphone." Eco-Site LLC v. Cty. of Pueblo, ___ F. Supp. 3d ___, No. 17-02535, 2019 WL 7168656, at *2 (D. Colo. Dec. 23, 2019).  As there was no prior rule expressly applicable under Section 332 of the TCA, the Court cannot conclude that any of the factors weigh in favor of finding that the new rule is a clarification.  Applying the 2018 Declaratory Ruling to the Board's Resolution would therefore be an impermissible retroactive application of the regulation, and the Court will therefore apply prior Third Circuit precedent.  See T-Mobile, Ne., LLC v. City of Wilmington, Delaware, No. 16-1108, 2020 WL 1245306, at *6 (D. Del. Mar. 16, 2020) (reaching same conclusion); Eco-Site, 2019 WL 7168656, at *5 (same).

## 2.   AT&T Has Demonstrated that the Proposed Facility Will Fill an Existing Gap in Service

In the alternative, AT&T argues it has demonstrated that the Board's denial of its Application is an effective prohibition on its provision of personal wireless services under prior Third Circuit caselaw.  The Court agrees.

Under the Third Circuit caselaw before the FCC's 2018 Declaratory Ruling, a local regulation is an "effective prohibition" of personal wireless services "where a carrier has demonstrated that (1) its facility will fill a significant gap in service, and (2) the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve." Sprint Spectrum, 606 F. App'x at 671.  A significant gap in service is determined by the extent of the coverage of the provider seeking to install its facility, and is not measured by reference to the available service from other providers. Sprint Spectrum, 2010 WL 4868218, at *9. A provider can demonstrate that their proposed facility is the least intrusive means of filling the gap by "showing that a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc." APT Pittsburgh, 196 F.3d at 480.

Here, there is no genuine dispute of material fact as to the presence of a gap in AT&T's coverage in the Borough.  The Board Resolution denying AT&T's Application expressly stated that there were "gaps in coverage experienced by" AT&T.  Board Resolution ¶ 10(a).  Although Defendants dispute that they admitted that there was a gap in coverage, Def. SOMF ¶ 1, there is no evidence in the record to suggest that there is anything other than a significant gap in coverage in the northern portion of the Borough.  AT&T's radio frequency expert has opined that "there is a large service gap in the Borough" and that the Proposed Facility would remedy it.  Villecco Report at 17.  Defendants acknowledge that the Mayor of the Borough and its police chief also both testified to the presence of a coverage gap.  Pl. SOMF ¶¶ 2-3.  Defendants presented no expert testimony or other evidence suggesting that there is no gap in coverage in the Borough.  The

Court therefore finds that there is no genuine dispute of material fact on this point, and AT&T has established the presence of a coverage gap.

Thus, to prevail on their effective prohibition claim, AT&T must demonstrate that it made a good faith effort to consider alternative sites, designs, technologies and placements.  APT Pittsburgh, 196 F.3d at 480.  They have done so here.  AT&T and Defendants attempted to locate the Proposed Facility on at least three other sites in the Borough:  a local utility property, another commercial lot near the same intersection, and on a piece of Borough-owned property.  Pl. SOMF ¶¶ 17-19.  The owner of the local utility property and the other commercial lot refused to lease space to AT&T, and the Borough sought (but never heard back from) the grantor of the Borough-owned property, who still holds a deed restriction preventing commercial use.  Id. ¶¶ 17-19, 22.  The Borough's Mayor testified that the Borough would not permit AT&T to use the latter property without permission from the grantor, which never came.  Id. ¶¶ 22-23.  AT&T has therefore demonstrated a good faith effort to investigate other possible sites for the Proposed Facility.

In terms of alternate technologies or designs, AT&T's radio frequency expert testified that the Proposed Facility is at the minimum height necessary to remedy its coverage gap, and that a DAS system was not feasible due to the size of the gap.  Id. ¶¶ 44, 47.  There is nothing in the record to suggest that any other site or technology would be capable of remedying the coverage gap, or that AT&T's assessments of these alternatives were not conducted in good faith.  AT&T has therefore demonstrated that its facility is the least intrusive means of remedying the coverage gap, within the meaning of the TCA, and it is entitled to summary judgment on Count II.

## V.   REMEDY

Having demonstrated that the Board's denial of its Application was not supported by substantial evidence and that the Board's denial has the effect of prohibiting its service, AT&T is entitled to summary judgment on Counts I and II of its Amended Complaint.  The Court may either remand this case to the Board for further proceedings, or "may order the required approvals be granted," without remand.  T-Mobile Ne., 942 F. Supp. 2d at 488 (citing Omnipoint Corp., 181 F.3d at 409).

Here, the Court will decline to immediately order approval for the Proposed Facility, but will rather direct the parties to schedule a conference with the Magistrate Judge to resolve any outstanding issues surrounding any necessary approvals for the Proposed Facility.  If the parties are unable to reach agreement, AT&T may request further relief from this Court.

## VI.   CONCLUSION

For the reasons stated above, AT&T's Motion for Summary Judgment as to Counts I and II is **GRANTED**.  An appropriate order follows.

*/s Madeline Cox Arleo*_____
HON. MADELINE COX ARLEO
UNITED STATES DISTRICT JUDGE